UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES D. KENDRICKS,<br><br>    Petitioner,<br><br>    v.<br><br>W.L. MONTGOMERY,<br><br>    Respondent. | No. 1:15-cv-01552-DAD-SKO HC<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**<br><br>**(Doc. 6)** |

    Petitioner, Charles D. Kendricks, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] He alleges one ground for habeas relief: the trial court erred in not *sua sponte* instructing on voluntary manslaughter as a lesser-included offense to murder. The Court referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304. Having reviewed the record as a whole and applicable law, the undersigned recommends that the Court deny the habeas petition.

---

[1] Petitioner has two § 2254 petitions for writ of habeas corpus pending before this Court (No. 1:15-cv-01552-DAD-SKO; No. 1:15-cv-01617-DAD-SKO). Because the grounds for relief in these cases arise from two separate state court cases, the Court will address each case individually. These Findings and Recommendations address case No. 1:15-cv-01552-DAD-SKO.

1

## I. Factual and Procedural Background[2]

In October 2005, Petitioner lived with his wife, Tiffany Carter ("Ms. Carter"), and Ms. Carter's children, S. and T. Petitioner and Ms. Carter had been together for five years and married for two years.

S. was 12 years old in 2005. At trial, she testified that Petitioner, her stepfather, and Ms. Carter argued often. S. witnessed Petitioner physically beat Ms. Carter on four or five occasions, and saw the marks and injuries on Ms. Carter from Petitioner hitting her. S. testified that on one occasion, Petitioner accused Ms. Carter of seeing another man and threatened, "If you cheated on me, I'll kill you."

On October 31, 2005, S. and her brother, T., walked home from school. When they arrived home, Petitioner and Ms. Carter were in their bedroom with the door closed, arguing and yelling. After approximately 30 minutes, S. knocked on the bedroom door to try and get Ms. Carter out of the room. Petitioner opened the door and S. saw Ms. Carter crying on the bedroom floor and a black gun on the bed. S asked Petitioner if "I could have my mom." Petitioner said that they were talking and shut the door.

T had an earache and wanted Ms. Carter to get his medicine. At this time, S. could still hear Petitioner and Ms. Carter arguing and Ms. Carter crying. S. knocked on the door again and Petitioner opened it and asked what she wanted. Ms. Carter was still on the floor. S. asked if "we could have our mom" because T. had an earache and needed medicine. Petitioner allowed Ms. Carter to get the medicine for T.

Ms. Carter walked to the kitchen to get the medicine while Petitioner stayed in the bedroom. Ms. Carter put ear drops in T.'s ear and walked back towards the bedroom. S. grabbed Ms. Carter's hand and tried to stop her from going back into the bedroom. Ms. Carter walked

---

[2] Factual information is derived from *People v. Kendricks*, (Cal.App. April 9, 2014) (No. F062491), and review of the record by the undersigned.

2

into the bedroom and S. let go of her hand.

Standing at the door to the bedroom, S. once again asked Petitioner for her mother and Petitioner "thumped" S.'s forehead and told her to go back to the living room. Angry, S. walked out to the front yard and slammed the house door. Petitioner "came after" S. and asked her where she was going. S. stated that she was going to call the police because Petitioner "won't give me my mom." Petitioner said, "I give you her when I'm done talking to her." At trial, S. characterized Petitioner as raising his voice and making this statement "with attitude because he was already mad."

Petitioner and S. walked back into the house. Petitioner went into the bedroom and closed the door. S. testified that it was silent for a long time, and she did not hear any more arguments that night.

Yesenia Esparza ("Ms. Esparza") lived next door to Petitioner and Ms. Carter, but did not know them. Around 11:00 a.m. on November 1, 2005, Ms. Esparza was in her backyard and heard the voices of a man and woman coming from Petitioner's house yelling, screaming, and arguing. Ms. Esparza could not hear what the people were yelling about and went back into her house and could not hear them anymore.

At approximately 12:00 p.m. on November 1, 2005, members of Petitioner's family arrived at Petitioner's house and discovered Ms. Carter dead on her bedroom floor.[3] Ms. Carter had been shot in the head.

Police and emergency personnel arrived at the house at approximately 1:00 p.m. Ms. Carter's body was lying face up on the bedroom floor. She had a single gunshot wound to the top of her head, and there was a pool of blood under her head. There were also blood spatters on both the ceiling and on the ceiling fan directly above Ms. Carter's body. S. gave a statement to police

---

[3] The different members of the family that arrived at the house on November 1, 2005, gave various explanations as to why they were at the house, and how they found Ms. Carter's body.

on the day Ms. Carter was found dead.[4]

At trial, the pathologist testified that Ms. Carter's death was a homicide, not a suicide. The defense argued that Ms. Carter's gunshot wound was the result of either an accident or was intentionally self-inflicted.

Petitioner was charged with (1) murder (Cal. Penal Code § 187(a)), with the special allegation that he personally and intentionally discharged a firearm, which proximately caused great bodily injury or death (Cal. Penal Code § 12022.53(d)); (2) assault with a firearm (Cal. Penal Code § 245(a)(2)); (3) criminal threats (Cal. Penal Code § 422); and (4) possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)). The prosecution further alleged that Petitioner had one prior strike conviction, one prior serious felony conviction, and one prior prison term enhancement.

On July 20, 2010, Petitioner pled no contest to being a felon in possession of a firearm. Thereafter, the murder trial began and on July 26, 2010, the court granted Petitioner's motion for a mistrial.[5]

Petitioner's retrial began on February 7, 2011. On February 18, 2011, the jury found Petitioner guilty of second degree murder and assault with a firearm and determined the special allegation that Petitioner personally discharged a firearm, which proximately caused great bodily injury or death to be true. The jury was unable to reach a verdict on the criminal threats charge, and the court declared a mistrial on that charge.

---

[4] At trial, S. stated that she was interviewed by police on the night of the homicide, November 1, 2005, and was not completely truthful during the interview because she was mad that her mother was dead and wanted Petitioner to get in trouble. S. falsely told police that on October 31, 2005, she went into the bedroom to get Ms. Carter, saw Petitioner pointing the gun at Ms. Carter, and Petitioner threatened S. if she called the police. S. testified that the rest of her statement about the events October 31, 2005, was correct. S. explained that she was now 17 years old and was telling the truth because she was old enough to "know how important this is."
[5] The record does not contain any further information about Petitioner's first trial.

4

Petitioner was sentenced to an aggregate term of 55 years to life plus 2 years. For the murder, Petitioner was sentenced to 15 years to life, doubled to 30 years, plus 25 years for the firearm allegation. For the assault with a firearm charge, Petitioner was sentenced to a consecutive term of 1 year, doubled to 2 years.

Petitioner appealed his conviction to the State Court of Appeal, Fifth Appellate District, which affirmed the conviction on April 4, 2014. On July 16, 2014, the California Supreme Court summarily denied review.

On December 2, 2015, Petitioner filed his first amended petition for writ of habeas corpus with this Court.

## II. Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even

a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III. The Court Did Not Err in Not Submitting a Lessor Included Offense to the Jury.

Petitioner contends that the trial court should have *sua sponte* instructed the jury on voluntary manslaughter as a lesser included offense of murder. (Doc. 6 at 3.) Respondent counters that the state court's failure to instruct on a lesser included offense does not present a federal question. (Doc. 19 at 9.)

#### a. Federal Habeas Review of the State Court Decision

Federal habeas corpus review is only available to correct violations of federal law. 28 U.S.C. §2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The Supreme Court has held that in capital murder cases, the defendant has a constitutional right to have the jury instructed on a lesser included offense. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). However, in *Beck*, the Supreme Court reserved judgment on whether the Due Process Clause also requires instruction on lesser included offenses in noncapital cases. *Id*. at 638, n. 14.

The Ninth Circuit has held the "[f]ailure of a state court to instruct on a lesser [included] offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) (citing *Grech v. Wainwright*, 492 F.2d 747, 748 (5th Cir. 1974)). The Ninth Circuit has declined to find constitutional error arising from the failure to instruct on lesser included offenses in noncapital cases. *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984). The *Bashor* court noted, however, that a defendant's right to adequate jury instructions on his theory of the case could, in some cases, constitute an exception to this general rule. *Id*.

#### b. State Court of Appeal Decision

The Court of Appeal noted that at trial, Petitioner's defense was that Ms. Carter committed suicide. *People v. Kendricks*, (Cal.App. April 9, 2014) (No. F062491), at 50. On appeal before the Court of Appeal, and before this Court, Petitioner contended that the court had a

*sua sponte* duty to instruct the jury on voluntary manslaughter as a lesser included offense of murder, even though Petitioner did not rely on the voluntary manslaughter defense at trial. *Id*. Petitioner maintained that there was evidence he killed Ms. Carter in the heat of passion during their argument about Ms. Carter's alleged infidelity. *Id*. The Court of Appeal found this argument to be "meritless." *Id*.

In analyzing the applicable law, the Court of Appeal stated:

> [Petitioner] was charged with murdering [Ms. Carter]. After the parties rested, the court discussed possible lesser included offenses with the prosecutor and defense counsel. Both parties agreed the evidence did not support instructions on any lesser included offenses. The prosecution argued [Petitioner] was guilty of second degree murder. [Petitioner] relied on the theory that [Ms. Carter] committed suicide and he was not guilty of any offense. [Petitioner] was convicted of second degree murder.
>
> [Petitioner] now contends the evidence would have supported an instruction on the lesser included offense of voluntary manslaughter based on heat of passion/provocation. Voluntary manslaughter is a lesser included offense of murder. (*People v. Rios* (2000) 23 Cal. 4th 450, 461.) If there was substantial evidence to support an instruction on voluntary manslaughter as a lesser included offense, the court had a sua sponte duty to give that instruction, even though it was inconsistent with his defense, and [Petitioner] did not forfeit or waive the issue by failing to request the instruction. The crucial question, however, is whether the evidence even supported voluntary manslaughter instructions based on the unique facts of this case.

*Id*. at 52-53.

The Court of Appeal noted that "[h]eat of passion arises when at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." *Id*. at 52 (internal citations and quotations marks omitted.) The heat of passion requirement has both an objective and subjective component. *Id*. To satisfy the subjective component, the person must actually kill under the heat of passion. *Id*. However, the circumstances that give rise to the heat of passion are viewed objectively. *Id*. To satisfy the objective component, the Court of Appeal explained that "this heat

8

of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances." *Id*. (internal citations and quotation marks omitted.)

The Court of Appeal determined that

> [t]he prosecutor's case demonstrated that [Petitioner] was obsessed with [Ms. Carter's] alleged infidelity, based on . . . letters [written by Petitioner] in 2005. In these letters, [Petitioner] refused to accept [Ms. Carter's] declarations and assurances of faithfulness. Instead, he repeatedly justified his prior physical abuse of her, declared his certainty that she was sleeping with numerous men in his absence, and threatened further harm if she did not obey or talk correctly to him.
>
> More chillingly, [Petitioner] declared he was "gonna drown you in the pool big time[ ]" if he discovered other men visited the house in his absence. As if to eliminate any doubt about his intentions, he wrote in another letter that he would beat [Ms. Carter] if he found out that [another man] had been in the house, and she would be "like (Lacey Peterson)" because "I don't care about going to jail, . . . I'll go on the run first until they catch me, so don't tempt me or go there. That's a promise. . . . 'I don't care if you're scared of dying or not cause that will make my job easier. . . .'"
>
> [T]he entirety of the record demonstrates [ ] arguments were simply continuations of the accusations and death threats that [Petitioner] delivered, without interruption, in the months leading to the homicide. [S.] testified about the situation in the bedroom the night before [Ms. Carter's] body was found, and described [Petitioner] yelling and [Ms. Carter] crying. However, S. never offered any testimony that supported evidence of [Ms. Carter's] purported provocation.
>
> As explained *ante*, a killing upon a sudden quarrel or heat of passion must occur "'suddenly as a response to the provocation, *and not belatedly as revenge or punishment*. . . .' [ ]" (*People v. Daniels*, [ ], 52 Cal. 3d at p. 868, italics added.) Contrary to [Petitioner's] arguments, extreme jealousy and preoccupation with someone's possible infidelity are insufficient to support instructions on voluntary manslaughter based on heat of passion. (*People v. Hyde* (1985) 166 Cal. App. 3d 463, 473.) "It is important . . . to distinguish between jealousy as a motive for the killing and jealousy sufficient to invoke the 'heat of passion' concept. . . ." [*Id*.] A defendant's jealousy of another person's alleged relationship with a third person, "in and of itself, is insufficient to allow a reasonable jury to conclude" that a killing was committed in the heat of passion. [*Id*.] "In order to warrant the giving of a voluntary manslaughter instruction, the evidence of defendant's jealousy must be such as to suggest he did not either intend to kill or act in conscious disregard of a substantial probability that death would result. Furthermore, defendant's 'passion' must be the result of 'sufficient provocation.' [ ]" [*Id*.]

9

> Aside from his unshakeable jealous[ ]y, there was no evidence that [Ms.] Carter engaged in any provocative conduct to warrant instructions for heat of passion/voluntary manslaughter. [internal citations omitted].
>
> In this case, . . ., there was insufficient evidence to establish heat of passion or provocation sufficient to support voluntary manslaughter instructions.

*Id*. at 54-57.

### c. The Trial Court Did Not Err by Failing to Instruct on Voluntary Manslaughter

Petitioner does not have a constitutional right to a jury instruction on the lesser included offense of voluntary manslaughter, because this was not a capital case. *Bashor*, 730 F.3d at 1240. Even considering the exception in *Bashor*—that the refusal of a court to instruct a jury on a lesser included offense when that offense is consistent with the defendant's theory of the case may constitute a cognizable habeas claim—there was no constitutional error in this case. Petitioner's theory of the case was that Petitioner was not guilty of any offense because Ms. Carter committed suicide. It would have been inconsistent with Petitioner's defense for the court to instruct on voluntary manslaughter when Petitioner never admitted to killing Ms. Carter.

The Court of Appeal also found there was no error in the trial court's refusal to instruct on voluntary manslaughter because substantial evidence did not support the charge. This Court agrees. As the Court of Appeal noted, voluntary manslaughter is an unlawful killing done without malice, in the heat of passion. Here, the record shows that Petitioner and Ms. Carter argued from the evening of October 31, 2005, into the early afternoon of November 1, 2005. S. testified that Petitioner and Ms. Carter were arguing when she arrived home from school until the evening. Petitioner's next door neighbor, Ms. Esparza, also stated that she heard yelling, screaming, and arguing when she was standing in her backyard at 11:00 a.m. on November 1, 2005. These arguments were a continuation of Petitioner's and Ms. Carter's arguments that continued throughout their entire relationship. On these facts, the Court cannot say that the Court

of Appeal clearly erred in ruling that the record did not support a voluntary manslaughter charge. For these reasons, the Court recommends denying Petitioner's petition for writ of habeas corpus.

**IV.     Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>     (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
>     (B) the final order in a proceeding under section 2255.
>
>     (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
>     (3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate

"something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication. Accordingly, the Court recommends declining to issue a certificate of appealability.

## V. Conclusion and Recommendation

Based on the foregoing, the undersigned recommends that the Court deny the petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **January 30, 2018**         /s/ *Sheila K. Oberto*
                                          UNITED STATES MAGISTRATE JUDGE

12